**TIMOTHY J. RACICOT**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**105 East Pine**
**Missoula, MT 59801**
**P.O. Box 8329**
**Missoula, MT 59807**
**Phone:   (406) 542-8851**
**FAX:      (406) 542-1476**
**E-Mail:   Tim.Racicot2@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**JOHN GREGORY ALEXANDER HERRIN,**<br><br>Defendant. | **CR 16-15-H-SEH**<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** |

### INTRODUCTION

The defendant, John Gregory Alexander Herrin, has moved to suppress evidence that he stole, embezzled or converted the money he is charged with transporting across state lines.   His motion should be denied for two reasons. First, the government is not required to charge anyone, including Herrin, with

1

taking the money from Garda.  Second, evidence that Herrin stole the money is relevant to two elements in count I – whether the money was in fact stolen and whether Herrin knew that when he transported it across state lines.

## PROCEDURAL BACKGROUND

On October 26, 2016, the grand jury returned a 14-count indictment against Herrin.  Count I charges interstate transportation of stolen property in violation of 18 U.S.C. § 2314.  Counts II through XIII charge money laundering in violation of 18 U.S.C. § 1957.  And count XIV charges attempted witness tampering in violation of 18 U.S.C. § 1512(b)(3).  Herrin appeared for arraignment on November 29, 2018.  Doc. 5.  On November 30, 2018, the Court entered a scheduling order, setting trial for January 22, 2018.  Doc. 8.  Herrin filed the motion to suppress on December 12, 2018.  Doc. 13.

## FACTUAL BACKGROUND

GardaWorld ("Garda") is a large company that provides a range of security services, including transporting United States currency to banks around Montana.  Herrin worked for Garda from 2012 until 2014.

On Tuesday, November 19, 2013, a Garda manager packed multiple ATM load bags in Helena, for delivery the next day.  The load bags contained United States currency and included three bags bound for Kalispell.  Those bags contained a total of $390,000, in the following sums and denominations:

$160,000 (in $50s and $20s); $150,000 (in $50s and $20s); and $80,000 (in $20s). Once all the load bags were prepared and sealed, they were secured in Garda's vault in Helena.

On Wednesday, November 20, 2013, at approximately 3:46 A.M., two Garda employees (the "Helena employees") opened the Helena branch and vault and moved all the load bags that had been prepared the previous day, including the three referenced above, onto the over-the-road ("OTR") truck. Those same employees then re-secured the vault and drove to Missoula. When they arrived in Missoula, the employees made several stops, including at a gas station and several banks. They met two other Garda employees (the "Missoula employees") at approximately 7:00 a.m. and transferred some load bags to another truck for the local route. Importantly, the Helena employees left the OTR truck unattended, though locked, at least three or four times while servicing banks and ATMs in Missoula, before continuing their trip to Kalispell. At approximately noon, the Helena employees arrived in Kalispell and met the Kalispell Garda truck, at which point they discovered the three bags containing the $390,000 were missing. They notified the Helena office and the Missoula truck, but did not find the bags.

Also on November 20, 2013, at approximately 5:20 p.m. (five hours after the theft was discovered), Herrin showed up at Garda's Helena branch even though he was not scheduled to work until the following day. He loaded coin onto his Garda

truck for the next day's route and left at approximately 6:15 p.m. The Garda branch manager in Helena told law enforcement it was not unusual for Herrin to load his truck the day before his shift.

Garda's Helena office conducted an internal investigation of company employees, but was unable definitively to implicate anyone in the disappearance of the $390,000. Garda's Regional Security Investigator conducted a separate investigation that included several employee interviews. One of the Missoula employees initially refused to answer questions, but was later interviewed by the FBI and denied any involvement in the theft.

Not long after the theft, Herrin's financial situation changed drastically. He went to Las Vegas from January 3-6, 2014. He stayed at the high-priced Aria casino, gambling and shopping with a female companion. Casino records indicate Herrin lost $103,000 while gambling at Aria. He also bought a watch for $22,600.

On January 7, 2014, after Herrin returned from Las Vegas, he went to Wells Fargo Bank and deposited a cashier's check from Aria for $123,500, along with $37,350 in cash. The entire amount – $160,870 – went into his checking account, which had a balance of $945.65 before the deposit. Herrin told the teller he went to Las Vegas with $500 and won $160,000 playing blackjack, poker and roulette. While bank personnel were counting the cash, a Garda courier came into the bank to make a pick up. Herrin walked away from the counter and sat at an online

banking station until the courier left, at which point he returned to the counter to complete the transaction. Two weeks after making the deposit, on January 21, 2014, Herrin withdrew $30,000 in cash from his checking account. The next day, he withdrew another $30,000 in cash.

Herrin went to Las Vegas again from January 24-27, 2014. During that trip, he won $49,650 gambling at the Aria, meaning his total loss at Aria for the two trips was $53,850. He used his Visa credit card to buy over $30,000 of merchandise from high-end luxury retail stores in Las Vegas and made transfers from his checking account of $11,000, $8,000, and $8,000 to pay down the balance on the card, which had a $12,000 limit.

On January 30, 2014, after the second trip to Las Vegas, Herrin went to Wells Fargo carrying a shoebox full of $20 bills and deposited the money into his checking account. The day before the deposit, the account balance was $3,550.58. He was not sure how much money was in the box but told the teller he had "another big score" in Vegas. He said he thought he had around $120,000 but was not certain because he had been throwing the money up and "making it rain." The amount of the deposit was $120,260. Herrin told the teller during the transaction he did not have a job but was doing some day trading. He said he had been a delivery driver but seemed nervous talking about work and steered the conversation away from his former employer. A Garda courier again entered the

5

bank while Herrin was there. Herrin had already moved to the online station while the cash was being counted, but he turned his back on the courier, seemingly in an effort not be seen by the Garda employee. One day after making the $120,260 deposit, Herrin transferred $60,000 into his Wells Fargo savings account.

In addition to traveling to Las Vegas twice in January 2014, Herrin started day trading. He opened an account with Ameritrade and made deposits totaling $111,100. Herrin lost $70,229.60 day trading in 2014 and gained $18.96 in 2015. His significant losses are inconsistent with statements he made to bank employees and his parents that he was making money day trading.

On March 24, 2014, Herrin and the female companion referenced above traveled from Las Vegas to Paris and Bordeaux, France. Herrin paid for the trip using his Visa card. The trip cost more than $20,000.

Herrin went to Las Vegas again around July 4, 2014. He spent $1,700 at the Eiffel Tower Restaurant on July 5 and $1,094.29 for his stay at Aria. He used his Visa card to pay both bills. He also got a cash advance on the card from Aria for $1,056.50. Herrin made over $19,000 in payments to Visa during July, all via ACH transactions.

Herrin moved to Springfield, Missouri, in approximately the spring of 2014, apparently to go to college. He spent over $6,500 in June on expenses associated with traveling to and getting settled in Missouri. Between August 20 and

6

September 19, 2014, Herrin used his Visa card to pay to enroll in college and for living expenses. By September 19, 2014, the balance on the card was $14,211.75. Herrin reported the card stolen and was issued a new one.

By the fall of 2014, approximately one year after the $390,000 was stolen from Garda, Herrin's financial situation was dire. He made one last payment of $261 on the Visa account in October 2014. By January 2015, he owed $17,753.93 on the card, which was about $754 over the credit limit. On February 3, 2015, Ford Motor Credit repossessed Herrin's car, which he had purchased on October 21, 2013, one month before the Garda theft.

Law enforcement officers interviewed several people during their investigation, including current and former Garda employees, Herrin's parents, and his female companion from the Las Vegas and France trips. All the Garda employees denied knowledge about and involvement in the disappearance of the $390,000. One former employee, who was also Herrin's one-time roommate, indicated Herrin showed him the Aria check for the gambling proceeds he purportedly won in January 2014. Herrin said he turned $500 into several thousand. The roommate could not remember the specific amount of the check, but thought it was $125,000 or $165,000. He said he did not know who stole the $390,000, but indicated employees left Garda trucks unattended from time to time against company policy. He also said Herrin told him a broom handle could be

used to unlock Garda trucks and even showed him how to unlock a truck by taking a broom handle and pushing it through a vent.

Herrin's parents denied knowing anything about the money missing from Garda. They said Herrin told them in January 2014 that he had won a large sum of money in Las Vegas. They were not surprised because they knew he gambled, but were shocked by the amount on the cashier's check he showed them. Herrin also said he had started day trading and offered to help them with their investments.

Herrin's former female companion recalled responding to his Craigslist ad in November or December of 2013. Herrin was seeking company during a trip to Las Vegas for the World Series of Poker. Herrin told her he lived in Montana and worked for a security company, and had made a lot of money playing poker. She said she watched Herrin play high stakes poker at the Aria and lose about $20,000. She also recalled him buying a $20,000 watch from a store at Aria and at one point giving her about $10,000 in $100 bills. In addition to giving her money, Herrin took her shopping during one of the trips to Las Vegas and bought her a $5,000 Louis Vuitton bag, $1,200 Tom Ford shoes, and over $2,000 worth of dresses. She also recalled the trip to France. She said she and Herrin flew first class to London, stayed one night, and then continued to Paris, where they had dinner with Herrin's friend. The two had a falling out because she was dating someone else,

and had little contact after the France trip other than occasional text messages. One text Herrin sent after the trip to France said words to the following effect: "If the FBI asks about me, say you don't know me."

## ARGUMENT

**1. The Court should treat Herrin's motion as in limine and not to suppress.**

Herrin moves the Court to suppress evidence that he stole the money from Garda on or about November 20, 2013. Doc. 13 at 6. Though captioned as a motion to suppress, Herrin's request is actually a motion in limine. See *United States v. Bundy*, 2017 WL 4584115 *3 (9th Cir. October 13, 2017) (comparing motions to suppress with motions in limine and noting that suppression motions involve allegations of constitutional violations, while motions in limine "determine whether evidence is admissible pursuant to the Federal Rules of Evidence.").

Herrin does not allege constitutional violations involved in the gathering of any evidence. Rather, he seeks to exclude evidence based on the government's charging decision, which he essentially concludes renders the evidence irrelevant and prejudicial. The Court should construe his papers as a motion in limine and not a motion to suppress. The distinction matters because the standard of review for motions in limine is abuse of discretion, while the standard for motions to suppress is *de novo*. Compare *United States v. Kessi*, 868 F.2d 1097, 1107 (9th Cir. 1989) (noting that balancing probative nature of evidence against prejudicial

9

effect is reviewed for abuse of discretion), with *United States v. Sanchez*, 337 Fed. Appx. 641, 642 (9th Cir. 2009) (affirming that rulings on suppression motions are reviewed *de novo*). Regardless of the character of Herrin's request and the corresponding standard of review, the Court should deny his motion.

### 2. The United States was not obligated to charge Herrin with bank embezzlement under 18 U.S.C. § 2113(b).

"The apparent purpose of Congress in enacting stolen property statutes was to discourage both the *receiving of stolen goods* and the initial taking." *United States v. McClain*, 545 F2d 988, 994 (5th Cir. 1977) (emphasis added). See also *United States v. Bolin*, 423 F.2d 834, 838 (9th Cir. 1970). In light of that congressional purpose, defendants like Herrin can be charged under § 2314 for receiving stolen property and transporting it across state lines, regardless of whether they stole it in the first place.

Herrin's argument that the United States was required to charge him with bank embezzlement under 18 U.S.C. § 2113(b) is simply wrong. The government is entitled to exercise discretion in determining what charges to present to the grand jury. The fact that Herrin could have been charged with bank embezzlement has no bearing on the validity of the indictment in this case. *United States v. Whaley*, 788 F.2d 581, 583 (9th Cir. 1986) ("the fact that [the defendant] might have been indicted for other crimes does not affect the validity of his indictment under section 2314."). As the Supreme Court wrote in *United*

10

*States v. Batchelder*, 442 U.S. 114, 123-124 (1979), "[t]his Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants. . . . Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."

### 3. Evidence that Herrin took the money is relevant and not more prejudicial than probative.

Having made the decision not to allege a violation of bank embezzlement, the remaining questions are whether the government can introduce evidence the money was stolen from Garda and that Herrin was the thief. The answer to both questions is yes. According to the Ninth Circuit pattern jury instruction, the elements of interstate transportation of stolen property are: (1) Herrin transported, transmitted or transferred stolen money between Montana and Nevada; (2) at the time the money crossed the Montana border, Herrin knew it was stolen; (3) Herrin intended to deprive the owner of the ownership of the money temporarily or permanently; and (4) the money was of a value of $5,000 or more. Manual of Model Criminal Jury Instructions for the Ninth Circuit, § 8.189. The instruction also notes that "the government need not prove who stole the [money]." *Id.*

Evidence that someone stole the money from Garda is directly relevant to the first three elements referenced above. The government must prove the money

was stolen in order to satisfy them. And evidence that Herrin stole the money is even more relevant. It helps establish that the money was actually stolen and, perhaps more importantly, goes to prove Herrin knew it was stolen when he transported it from Montana to Las Vegas and intended to deprive the owner of temporary or permanent ownership of the money. The notion that the government would be precluded from introducing evidence that Herrin stole the money, simply because he is not charged with bank embezzlement, is misguided. As long as the evidence is relevant to a fact in issue, and not more prejudicial than probative, it is admissible. Fed. R. Evid. 401, 403. Herrin's tortured analysis cannot shroud that straightforward precept.

Herrin seeks to hamstring the government's presentation of evidence by assuming he knows the potential theories of the case. Doc. 14. He contends one theory is that Herrin's colleagues at Garda took the money "as a crime of opportunity" and Herrin later transported it to Nevada. Doc. 14 at 5. Another theory is that Herrin stole the money. *Id.* At 5-6. What Herrin ignores is that it makes no difference who took the money. Herrin is charged with transporting stolen property across state lines, which is what the United States is obligated to prove. The identity of the thief, other than being relevant to show the money was stolen – and Herrin knew it – matters not.[1]

---

[1] Herrin further contorts his argument by asserting the government charged the first

Herrin further contends that any suggestion he stole the money "involves a different set of legal facts and elements because it forces the government to actually prove beyond a reasonable doubt that [he] took the money." Doc. 14 at 6. But the elements of the offense charged in count I do not change depending on the identity of the thief. And, as noted above, evidence from which the jury can infer Herrin's involvement in the theft is relevant to three elements of the crime – the nature of the money as stolen, Herrin's knowledge of that fact, and his intent to deprive the owner of ownership.

The Ninth Circuit confronted an argument similar to Herrin's in *Helberg v. United States*, 365 F.2d 314 (9th Cir. 1966). There, a jury convicted the defendants of interstate transportation of stolen property after someone burglarized a Seattle pharmacy and stole several money orders. *Helberg*, 365 F.2d at 315. The government did not charge the defendants with burglary, but the district court admitted evidence of the break-in at trial. *Id.* The defendants argued the admission of that evidence denied them a fair trial, but the Ninth Circuit disagreed. *Id.* at 316. The court noted the defendants failed to object to the burglary evidence before concluding the trial was fair. Though lacking in analysis, the decision is a logical extension of the government's argument here – the evidence of

---

theory he outlined – someone other than Herrin stole the money and he merely transported it. But the indictment contains no allegation that Herrin did or did not take the cash off the Garda truck.

13

burglary in *Helberg* was relevant to proving essential elements of the crime, including the nature of the money orders as stolen and the defendants' knowledge of that fact.

A few years after *Helberg*, the Ninth Circuit faced this issue again, in *United States v. Desmond*, 419 F.2d 1286 (9th Cir. 1969). Desmond was charged with a violation of § 2314 and objected to the admission of evidence of other crimes, namely that the checks were stolen from the victims in Nevada and cashed by the defendant in Texas. *Desmond*, 419 F.2d at 1286. The appellate court upheld the admission of the challenged evidence, noting:

> Evidence that the checks were stolen was relevant to prove that the owners had not authorized anyone else to cash them. Desmond's possession of the stolen credit cards was relevant to prove that he was the person who had cashed the checks. The probative force of that evidence substantially outweighed its prejudicial effect. The other offenses were intimately connected with the offenses for which he was on trial, and there was no error in admitting that evidence.

*Id.* at 1287.

The court's reasoning in *Desmond* applies here with equal force. Evidence that Herrin may have been involved with the theft of Garda's money is "intimately connected with" the charge in count I. And the probative value of that evidence substantially outweighs any potential prejudicial effect. See also *Thomas v. United States*, 343 F.2d 49, 52-53 (9th Cir. 1965) (finding no error in the

14

admission of evidence that a check was stolen by someone because it was "relevant and material" and "tended to show that, whether or not [the defendant] had anything to do with the theft, he did not have [the victim's] authority to cash the check.").

The case Herrin cites in support of his argument – *Whalen v. United States*, 445 U.S. 684 (1980) – is inapposite for one primary reason. *Whalen* involves the potential for separate punishments in a felony murder case where the predicate felony – rape – merged with the homicide. *Whalen*, 445 U.S. at 686, 694. The question for the Court was one of Double Jeopardy, whether terms of imprisonment could be imposed for both the rape and the murder, notwithstanding that the underlying rape was a lesser-included offense of the felony murder.

The conundrum in *Whalen* has no bearing on this case. Herrin will not face double punishment for the offense charged in count I. If the jury convicts, it will not matter whether they believe he stole the money or simply received it from someone else before transporting it to Las Vegas.[2] Under either scenario, he will be guilty of one crime – interstate transportation of stolen property as charged in count I. The issue the Supreme Court confronted in *Whalen* is not before this Court.

---

[2] In fact, the jury will not be asked to agree about the identity of the thief, since the government does not need to prove that fact. Manual of Model Criminal Jury Instructions for the Ninth Circuit, § 8.189.

15

## CONCLUSION

For the foregoing reasons, the Court should deny Herrin's motion to suppress.

DATED this 17th day of December 2018.

                                            KURT G. ALME
                                            United States Attorney

                                            */s/ Timothy J. Racicot*
                                            Assistant U.S. Attorney
                                            Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2018, the United States served a copy of the foregoing document on the following persons by the following means:

    (1,2)  CM/ECF
    ( )     Hand Delivery
    ( )     U.S. Mail
    ( )     Overnight Delivery Service
    ( )     Fax
    ( )     E-Mail

1.   Clerk, U.S. District Court

2.   Michael Donahoe
    Deputy Federal Defender
    Federal Defenders of Montana
    50 West 14th Street, Suite 1
    Helena, MT 59601

                                            */s/ Timothy J. Racicot*
                                            Assistant U.S. Attorney
                                            Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. L.R. 7.1(d)(2) and CR 47.2, the attached Response in Opposition to Defendant's Motion to Suppress is proportionately spaced, has a typeface of 14 points or more, and the body contains approximately 3,469 words.

*/s/ Timothy J. Racicot*
Assistant U.S. Attorney
Attorney for Plaintiff
