**TIMOTHY J. RACICOT**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 8329**
**Missoula, MT 59807**
**105 East Pine Street, 2nd Floor**
**Missoula, MT 59801**
**Phone:      (406) 542-8851**
**FAX:        (406) 542-1476**
**Email:      Tim.Racicot2@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JOHN GREGORY ALEXANDER HERRIN,**<br><br>**Defendant.** | **CR 16-15-H-SEH**<br><br>**TRIAL BRIEF** |

The United States of America hereby submits the following trial brief, in compliance with the Court's scheduling order. Doc. 8. Defendant John Gregory Alexander Herrin is proceeding to trial on January 22, 2019, in Helena, Montana. He is charged in a 14-count indictment with one count of interstate transportation of stolen property (18 U.S.C. § 2314) (count I), 12 counts of money laundering (18

U.S.C. § 1957) (counts II-XIII), and one count of attempted witness tampering (18

U.S.C. § 1512(b)(3)) (count XIV).

## *FRYE* CONSIDERATIONS

Though Herrin is proceeding to trial, the United States notes for the record

that a plea offer was extended in writing that, in the government's view, would

have been more beneficial to Herrin than a conviction following a trial.

Specifically, the government offered to allow Herrin to plead guilty to counts I and

II of the indictment and agreed to move to dismiss counts III through XIV and

recommend all three points for acceptance of responsibility and timely notification

of plea.  Herrin rejected the government's offer.  See *Missouri v. Frye*, 132 S.Ct.

1399 (2012).

## FACTS

GardaWorld ("Garda") is a large company that provides a range of security

services, including transporting United States currency to banks and businesses

around Montana.  Herrin worked for Garda from 2012 until 2014.

On Tuesday, November 19, 2013, a Garda manager packed multiple ATM

load bags in Helena, for delivery the next day.  The load bags contained United

States currency and included three bags bound for Kalispell.  Those bags contained

a total of $390,000, in the following sums and denominations:  $160,000 (in $50s

and $20s); $150,000 (in $50s and $20s); and $80,000 (in $20s).  Once all the load

bags were prepared and sealed, they were secured in Garda's vault in Helena.

On Wednesday, November 20, 2013, at approximately 3:46 A.M., two

Garda employees (the "Helena employees") opened the Helena branch and vault

and moved all the load bags that had been prepared the previous day, including the

three referenced above, onto the over-the-road ("OTR") truck.  Those same

employees then re-secured the vault and drove to Missoula.  When they arrived in

Missoula, the employees made several stops, including at a gas station and several

banks.  They met two other Garda employees (the "Missoula employees") at

approximately 7:00 a.m. and transferred some load bags to another truck for the

local route.  Importantly, the Helena employees left the OTR truck unattended,

though locked, at least three or four times while servicing banks and ATMs in

Missoula, before continuing their trip to Kalispell.  At approximately noon, the

Helena employees arrived in Kalispell and met the Kalispell Garda truck, at which

point they discovered the three bags containing the $390,000 were missing.  They

notified the Helena office and the Missoula truck, but did not find the bags.

Also on November 20, 2013, at approximately 5:20 p.m. (five hours after the

theft was discovered), Herrin showed up at Garda's Helena branch even though he

was not scheduled to work until the following day.  He loaded coin onto his Garda

truck for the next day's route and left at approximately 6:15 p.m.  The Garda

branch manager in Helena told law enforcement it was not unusual for Herrin to load his truck the day before his shift.

Garda's Helena office conducted an internal investigation of company employees, but was unable definitively to implicate anyone in the disappearance of the $390,000. Garda's Regional Security Investigator conducted a separate investigation that included several employee interviews. One of the Missoula employees initially declined to answer questions and referred the Garda investigator to his lawyer. He was interviewed later by the FBI and denied any involvement in the theft.

Not long after the theft, Herrin's financial situation changed drastically. He went to Las Vegas from January 3-6, 2014. He stayed at the high-priced Aria casino, gambling and shopping with a female companion. Casino records indicate his initial buy-in at Aria's cash cage was $20,000, on January 3, 2014. The next day, he made another cash deposit for $29,000. And on January 5, 2014, Herrin deposited another $56,850 in cash at Aria. According to Aria's records, Herrin "won" $97,250, though that figure includes his initial deposits, which total $105,850. He also bought a watch for $22,600, for which he paid cash.

On January 7, 2014, after Herrin returned from Las Vegas, he went to Wells Fargo Bank and deposited a cashier's check from Aria for $123,500, along with $37,350 in cash. The entire amount – $160,870 – went into his checking account,

which had a balance of $945.65 before the deposit.  Herrin told the teller he went

to Las Vegas with $500 and won $160,000 playing blackjack, poker and roulette.

While bank personnel were counting the cash, a Garda courier came into the bank

to make a pick up.  Herrin walked away from the counter and sat at an online

banking station until the courier left, at which point he returned to the counter to

complete the transaction.  Two weeks after making the deposit, on January 21,

2014, Herrin withdrew $30,000 in cash from his checking account.  The next day,

he withdrew another $30,000 in cash.

      Herrin went to Las Vegas again from January 24-27, 2014.  During that trip,

his initial buy-in at Aria was $50,100 in cash, and he lost $50,000.  He also used

his Visa credit card to buy over $30,000 of merchandise from high-end luxury

retail stores in Las Vegas and made transfers from his checking account of

$11,000, $8,000, and $8,000 to pay down the balance on the card, which had a

$12,000 limit.

      On January 30, 2014, after the second trip to Las Vegas, Herrin went to

Wells Fargo carrying a shoebox full of $20 bills and deposited the money into his

checking account.  The day before the deposit, the account balance was $3,550.58.

He was not sure how much money was in the box but told the teller he had

"another big score" in Vegas.  He said he thought he had around $120,000 but was

not certain because he had been throwing the money up and "making it rain."  The

amount of the deposit was $120,260.  Herrin told the teller during the transaction he did not have a job but was doing some day trading.  He said he had been a delivery driver but seemed nervous talking about work and steered the conversation away from his former employer.  A Garda courier again entered the bank while Herrin was there.  Herrin had already moved to the online station while the cash was being counted, but he turned his back on the courier, seemingly in an effort not be seen by the Garda employee.  One day after making the $120,260 deposit, Herrin transferred $60,000 into his Wells Fargo savings account.

In addition to traveling to Las Vegas twice in January 2014, Herrin started day trading.  He opened an account with Ameritrade and made deposits totaling $111,100.  Herrin lost $70,229.60 day trading in 2014 and gained $18.96 in 2015.  His significant losses are inconsistent with statements he made to bank employees and his parents that he was making money day trading.

On March 24, 2014, Herrin and the female companion referenced above traveled from Las Vegas to Paris and Bordeaux, France.  Herrin paid for the trip using his Visa card.  The trip cost more than $20,000.

Herrin went to Las Vegas again around July 4, 2014.  He spent $1,700 at the Eiffel Tower Restaurant on July 5 and $1,094.29 for his stay at Aria.  He used his Visa card to pay both bills.  He also got a cash advance on the card from Aria for

$1,056.50.  Herrin made over $19,000 in payments to Visa during July, all via ACH transactions.

Herrin moved to Springfield, Missouri, in approximately the spring of 2014, apparently to go to college.  He spent over $6,500 in June on expenses associated with traveling to and getting settled in Missouri.  Between August 20 and September 19, 2014, Herrin used his Visa card to pay to enroll in college and for living expenses.  By September 19, 2014, the balance on the card was $14,211.75. Herrin reported the card stolen and was issued a new one.

By the fall of 2014, approximately one year after the $390,000 was stolen from Garda, Herrin's financial situation was dire.  He made one last payment of $261 on the Visa account in October 2014.  By January 2015, he owed $17,753.93 on the card, which was about $754 over the credit limit.  On February 3, 2015, Ford Motor Credit repossessed Herrin's car, which he had purchased on October 21, 2013, one month before the Garda theft.

Law enforcement officers interviewed several people during their investigation, including current and former Garda employees, Herrin's parents, and his female companion from the Las Vegas and France trips.  All the Garda employees denied knowledge about and involvement in the disappearance of the $390,000.  One former employee, who was also Herrin's one-time roommate, indicated Herrin showed him the Aria check for the gambling proceeds he

purportedly won in January 2014. The roommate could not remember the specific

amount of the check, but thought it was $125,000 or $165,000. He said he did not

know who stole the $390,000, but indicated employees left Garda trucks

unattended from time to time against company policy. He also said a broom

handle could be used to unlock Garda trucks and had seen Herrin unlock a truck by

taking a broom handle and pushing it through a vent.

Herrin's parents denied knowing anything about the money missing from

Garda. They said Herrin told them in January 2014 that he had won a large sum of

money in Las Vegas. They were not surprised because they knew he gambled, but

were shocked by the amount on the cashier's check he showed them. Herrin also

said he had started day trading and offered to help them with their investments.

Herrin's former female companion recalled responding to his Craigslist ad in

November or December of 2013. Herrin was seeking company during a trip to Las

Vegas for the World Series of Poker. Herrin told her he lived in Montana and

worked for a security company, and had made a lot of money playing poker. She

said she watched Herrin play high stakes poker at the Aria on one occasion and

lose about $20,000. She also recalled him buying a $20,000 watch from a store at

Aria and at one point giving her about $10,000 in $100 bills to go shopping. In

addition to giving her money, Herrin took her shopping during one of the trips to

Las Vegas and bought her a $5,000 Louis Vuitton bag, $1,200 Tom Ford shoes,

and over $2,000 worth of dresses.  She also recalled the trip to France.  She said she and Herrin flew first class to London, stayed one night, and then continued to Paris, where they had dinner with Herrin's friend.  The two had a falling out because she was dating someone else, and had little contact after the France trip other than occasional text messages.  One text Herrin sent after the trip to France said words to the following effect:  "If the FBI asks about me, say you don't know me."

## WITNESSES

The government intends to call approximately 22 witnesses and anticipates concluding its case in chief on Friday, January 25, 2019.  The witnesses include persons employed by Garda in November 2013, some of whom were subjects of the company's internal investigation into the stolen money.  The government will also call witnesses with exposure to and knowledge of Herrin's financial situation before and after the theft of the money, bank employees who processed Herrin's large cash deposits, and two investigating agents.

## EVIDENCE

The evidence in this case will consist of records received from Garda, including surveillance photos from November 20, 2013, as well as financial records detailing Herrin's financial status and spending habits in the months preceding and following the theft of the money, and flight records detailing his

travel during the relevant time period.  The United States does not anticipate any

unique evidentiary issues in this case, other than those presented by Herrin in his

motion to suppress, which presumably will be resolved prior to trial.

## LEGAL ISSUES

The United States will present witnesses with direct knowledge of Herrin's

sudden accumulation of wealth just weeks after someone stole $390,000 in cash off

a Garda truck.  Some of those witnesses will relay statements Herrin made to them

during their dealings with him, which are admissible under Federal Rule of

Evidence 801(d)(2).  Herrin has indicated a willingness to stipulate to the

foundation and authenticity of certain financial and other documents, which will

streamline the presentation of the government's case.  Though he reserves the right

to object to that evidence based on relevance or unfair prejudice, the Court can

resolve those objections during the course of the trial.  In short, the government

does not anticipate any noteworthy legal issues arising at trial, once Herrin's

motion to suppress is resolved.

Respectfully submitted this 7th day of January, 2019.

KURT G. ALME
United States Attorney


*/s/ Timothy J. Racicot*
Assistant U.S. Attorney
Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Local Rule CR 47.2(c).  The

brief contains approximately 2,365 words.

KURT G. ALME
United States Attorney


*/s/ Timothy J. Racicot*
Assistant U.S. Attorney
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2019, a copy of the foregoing document

was served on the following persons by the following means:

    (1,2)  CM/ECF
    ( )     Hand Delivery
    ( )     U.S. Mail
    ( )     Overnight Delivery Service
    ( )     Fax
    ( )     E Mail

1.    Clerk, U.S. District Court

2.    Michael Donahoe
       Deputy Federal Defender
       Federal Defenders of Montana
       50 West 14th Street, Suite 1
       Helena, MT 59601

*/s/ Timothy J. Racicot*
Assistant U.S. Attorney
Attorney for Plaintiff